

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 13, 2023**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 22-30049** |
| **ACTITECH, L.P.,** | § | **(Chapter 11; Subchapter V)** |
| Reorganized Debtor. | § | |

| | | |
|---|---|---|
| **ACTITECH, L.P., and** | § | |
| **ACTICHEM, L.P.,** | § | |
| Plaintiffs, | § | |
| | § | |
| **vs.** | § | |
| | § | **ADVERSARY NO. 22-03001** |
| **LACORE NUTRACEUTICALS, INC.,** | § | |
| **MC-GP, LLC, JOHN LABONTE** | § | |
| **SHERMAN 301-B, LLC, and SHERMAN** | § | |
| **301-A, LLC,** | § | |
| Defendants. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF JUDGMENT:**
**(A) DECLARING REORGANIZED DEBTOR IS NOT THE OWNER OF CERTAIN**

1

<u>**DISPUTED PROPERTY AT SHERMAN, TEXAS MANUFACTURING FACILITY; AND
(B) DENYING REQUEST FOR TURNOVER OF SUCH PROPERTY
PURSUANT TO SECTION 542**</u>

CAME ON FOR TRIAL before this court on October 28, November 4 and 9, and December 13, 2022, the above-referenced Adversary Proceeding (herein so called) filed by two Plaintiffs: (i) one a Chapter 11 Debtor whose plan was confirmed during the pendency of this Adversary Proceeding; and (ii) the other, a company affiliated with the Debtor, which is not itself in bankruptcy (together, the "Plaintiffs").    Plaintiffs request: (a) a declaratory judgment determining that the Reorganized Debtor is the owner of massive amounts of manufacturing equipment inside a 96-acre manufacturing facility at which it previously operated; and (b) an order of turnover of such property, pursuant to section 542 of the Bankruptcy Code.    The court heard testimony of seven witnesses—some live and some via declarations or deposition.    The court admitted 240 exhibits—many of which were pictures of equipment.    Post-hearing briefing was submitted on January 3, 2023.    The court has determined that Plaintiffs have failed to meet their burden of proving the Debtor's ownership of the property in question.    The court issues these Findings of Fact and Conclusions of Law in support of this decision, pursuant to Fed. R. Bankr. Pro. 7052.    Any Finding of Fact that should more properly be characterized as a Conclusion of Law should be deemed as such, and *vice versa*.

## I.    INTRODUCTION

This Adversary Proceeding presents a disagreement regarding a prepetition Purchase and Sale Agreement and whether certain manufacturing equipment was sold pursuant to it or not.

ActiTech, L.P. ("ActiTech," the "Debtor," or sometimes the "Reorganized Debtor") and Actichem, L.P., the Debtor's sister company (a nondebtor), are Plaintiffs. ActiTech is an operating company, in the business of developing, manufacturing, and selling nutraceuticals, creams, and personal care products. The sister company Actichem, L.P. was formed in the year 2005 as a real estate holding company; it thereafter acquired a large manufacturing facility (more than 500,000 square feet in size) from the iconic, multinational company Johnson & Johnson in Sherman, Texas (the "Sherman Facility") for the Debtor's operations.

Eventually, the Debtor and Actichem, L.P. decided to sell the Sherman Facility.  On June 9, 2021, Actichem, L.P. entered into a Purchase and Sale Agreement with a purchaser. At closing, three additional documents were executed:  a Special Warranty Deed; a General Assignment and Bill of Sale; and a Temporary Access and Right of Entry Agreement. The latter document addressed a process and deadlines for the seller's post-closing removal of certain property that was not sold pursuant to the Purchase and Sale Agreement. Closing on the sale of the Sherman Facility took place July 2, 2021.

Around the time of the execution of the closing documents, the new owners of the Sherman Facility entered into a lease agreement with a different company (a company that— similar to the Debtor—was also in the business of manufacturing nutraceuticals), giving it the right of use and possession of the Sherman Facility. Post-closing, a dispute arose regarding the Temporary Access and Right of Entry Agreement.  Not only had Actichem, L.P. failed to retrieve the personal property from the Sherman Facility that was not sold pursuant to the Purchase and Sale Agreement, but Plaintiffs were suddenly taking the position that they were

3

entitled to remove certain ***manufacturing equipment*** that the purchaser and new tenant believed had been purchased.

On January 10, 2022, Debtor filed for bankruptcy to obtain a breathing spell from litigation filed by several creditors. On January 11, 2022, the Plaintiffs filed this Adversary Proceeding against the purchaser under the Purchase and Sale Agreement, the assignees of the purchaser, the new tenant at the Sherman Facility, and the Chief Executive Officer of the new tenant (collectively, the "Defendants"), seeking turnover of much of the manufacturing equipment at the Sherman Facility. Plaintiffs argue that post-closing, the Defendants wrongfully deprived them of retrieving this equipment and other property Plaintiffs left behind.  Defendants responded, claiming that all manufacturing equipment was sold pursuant to the Purchase and Sale Agreement, and that Debtor and Actichem, L.P. had themselves breached the Temporary Access and Right of Entry Agreement by failing to timely remove inventory and raw materials (and other random items not included in the Purchase and Sale Agreement—including boxes of the Chief Executive Officer's personal items) that remained at the Sherman Facility.

This Adversary Proceeding mostly boils down to what in fact was purchased and sold, pursuant to the Purchase and Sale Agreement and other transaction documents.

## II.     PARTIES' STIPULATED FACTS

1.     On June 9, 2021, Actichem, L.P. ("Actichem") [a non-debtor affiliate of the Debtor][1] and MC-GP, LLC ("MC-GP") executed a Purchase and Sale Agreement whereby

---

[1] The bracketed language has been added by the court to the Parties' Stipulated Facts for clarity.

Actichem, as Seller, agreed to convey to MC-GP, as Purchaser, the manufacturing facility located in Sherman, Texas that Actichem had purchased [many years earlier] from Johnson & Johnson. This property was located at 301 W. FM 1417, Sherman, TX 75090 (the "Sherman Facility").

2.    MC-GP assigned its rights under the Purchase and Sale Agreement to Sherman 301-A, LLC ("Sherman 301-A") and Sherman 301-B, LLC ("Sherman 301-B").

3.    On June 30, 2021, Sherman 301-A and Sherman 301-B entered into a Commercial Net, Net, Net Lease Agreement with LaCore Nutraceuticals, Inc. ("LaCore Nutraceuticals"), giving it the right of possession to the Sherman Facility.

4.    Closing occurred on or about July 2, 2021. On such date, Actichem executed three additional documents:

    a.  A Special Warranty Deed conveying the Sherman Facility to Sherman 301- A and Sherman 301-B;

    b.  A General Assignment and Bill of Sale (the "Bill of Sale") executed also with Sherman 301-A and Sherman 301-B; and

    c.  A Temporary Access and Right of Entry Agreement (the "Temporary Access Agreement") also executed with Sherman 301-A and Sherman 301-B.

5.    Pursuant to the Agreed Scheduling Order entered by this court on February 24, 2022 [Doc. 38], Rosen Systems, Inc. prepared an audit report of the property located at the Sherman Facility. The "Rosen Report" as defined herein includes the lot numbers, description of property, and pictures of property, all of which were provided by Rosen Systems, Inc.

6.      Since at least January 31, 2019, an individual named Ms. Elysiann Bishop has had full control of both Actichem and ActiTech.

7.      Since at least January 31, 2019, Actichem has had no employees.

### III.     COURT'S ADDITIONAL FINDINGS OF FACT

1.      ActiTech, the Debtor, and Actichem, the non-debtor sister company, shared the same accounting department, offices, and resources since at least January 31, 2019.

2.      On or about June 21, 2005, the Sherman Facility was acquired by Actichem.[2] The Debtor ActiTech engaged in manufacturing operations there for several years. Actichem treated ActiTech as its tenant, collecting rent from it, but there was no written lease.  Eventually, the Plaintiffs made the decision to try to sell the Sherman Facility.

A.  The Purchase and Sale Agreement ("PSA")

3.      On June 9, 2021, Actichem, as Seller, and MC-GP, as Purchaser, executed the Purchase and Sale Agreement (the "PSA") in which MC-GP agreed to purchase and Actichem agreed to sell "Property" defined as "the Real Property, the Personal Property, Contracts, and the Intangible Property."  The Debtor ActiTech was not a party to the PSA.

4.      "Real Property" was defined as "Land" comprised of approximately 96 acres of real estate located in Sherman, Texas and all "Improvements" comprised of ***"all improvements and fixtures located on the Land that are owned by the Seller, including, without limitation, the industrial building and parking areas***."[3]

---

[2] Doc. 212, Trial Transcript – Day 1, 37:5-38:14.
[3] Joint Exhibit 3, § 1.8.1. Emphasis added.

6

5.      "Personal Property" was defined as "fixtures, including the furniture, equipment, machinery, that *is* attached to the Property.  Furthermore, tanks located at the south end of the facility (water filtration system and its technology) will remain at the facility."[4]

6.      "Contracts" was defined as including service contracts and "other agreements relating to the operation, repair or maintenance of the Real Property, Personal Property or Intangible Property."[5]

7.      "Intangible Property" was defined as the Seller's "right, title and interest in and to all permits, licenses, approvals, entitlements, plans, specifications, architectural and engineering drawings, and other similar intangible property owned by Seller."[6]

8.      Excluded from the Personal Property sold pursuant to the PSA was cash and other liquid assets, books and records, and all "Inventory," which was defined as "the products, raw materials, containers, and similar items previously used by Seller or its Tenant in the manufacture and production of products at the Property."[7]

9.      The purchase price for the Property was $19,000,000.00.

10.     The closing on the sale of the Property occurred on July 2, 2021 (the "Closing Date").

11.     Defendants furnished the purchase price on the Closing Date.

---

[4] *Id.* at § 1.8.2. Emphasis in original.
[5] *Id*. at § 1.8. 3.
[6] *Id.* at § 1.8.4.
[7] *Id*. at § 1.8.2.

12.     Actichem agreed in the PSA that, "upon completion of the Closing, Seller shall deliver possession of the Property to Purchaser, subject only to the Leases and Permitted Encumbrances…."[8]

13.     ActiTech, the Debtor, was not identified in the PSA as an owner of any of the Property, nor as a party to a Lease.

14.     Elysiann Bishop executed the PSA on behalf of Actichem. Actichem was represented by an attorney named Anthony Farmer.[9] Actichem had retained a broker on the transaction identified as "KW Commercial (David Dunaway) and Brigg Freemen (Tre Black), (collectively the "Broker")."[10] The PSA indicated that the Broker would be paid by Seller "per a separate Agreement." That separate agreement was not offered into evidence.

15.     Elysiann Bishop exclusively and solely controlled both ActiTech and Actichem at all relevant times during the transaction culminating in the sale of the Property.

16.     Matthew J. Coit executed the PSA on behalf of Purchaser, MC-GP. Purchaser was represented by an attorney named Ira Levy at Glast, Phillips & Murray, P.C.[11] Matthew Coit credibly testified[12] that he dealt with David Dunaway who he believed to be Seller's broker (and who is mentioned as such in Section 12 of the PSA) in the negotiations regarding MC-GP's purchase of the Sherman Facility. David Dunaway also mentioned to Mr. Coit that he was working

---

[8] *Id*. at § 10.8.
[9] *Id.* at § 1.1.
[10] *Id.* at § 12.
[11] *Id.* at §§ 1.2.
[12] Doc. 214, Trial Transcript – Day 3, 27:4-31:13.

with a Mr. Black (who was presumably Tre Black—who is also mentioned in Section 12 of the PSA). Mr. Coit credibly testified that during his first communication with Mr. Dunaway, Mr. Coit indicated that he had $10 million he was interested in investing in the property. Negotiations then ensued, with Mr. Coit bringing his offer up to $16 million, making clear that this included the machinery at the Sherman Facility. There were discussions back and forth regarding a price that might include a leaseback to the Seller, versus a price that would not, and a price with equipment included, versus a price without. The purchase price ultimately agreed upon was $19 million. Mr. Coit credibly testified that it was his understanding that this included everything but inventory, raw materials, and books and records. David Dunaway and Tre Black were not witnesses at the trial. While Elysiann Bishop did testify at trial, her command of the facts regarding the PSA terms and negotiations was not strong. Ms. Bishop is clearly the development and marketing person for ActiTech, more than a businessperson.

17. Actichem agreed in the PSA to make available to MC-GP the following documents: all leases and guaranty agreements related to the Property and rent rolls and the last three (3) years tenant reconciliation invoices and spreadsheets for Additional Rent for NNN operation expense charges.[13]

18. Actichem produced no lease agreements to MC-GP in connection with the sale of the Property. As earlier noted, there was no written lease agreement between Actichem and ActiTech regarding ActiTech's right to use or occupy the Sherman Facility. There is also no

---

[13] Joint Exhibit 3, § 4.3.

particular document evidencing the purported ownership by ActiTech of any of the personal

property in the Sherman Facility.

19.     The PSA provided that it contained the entire agreement between Actichem and

MC-GP concerning the purchase of the Property and superseded any prior understanding or written

or oral agreement between the parties with respect to the sale.[14]

20.     Actichem and MC-GP agreed that the PSA could only be modified by a written

document signed by both parties. No such modification was made.[15]

21.     Actichem, as Seller, made the following representations in section 7 of the PSA,

which survived closing:

     a.  It had the full right, power, and authority to execute and deliver the PSA and to

        consummate the purchase and sale transaction provided for in the PSA (including

        transferring the Property) without obtaining any further consents or approvals from,

        or the taking of any other actions with respect to, third parties.

     b.  There were no leases, licenses, or other occupancy rights with respect to the Real

        Property other than those constituting "Permitted Encumbrances."

     c.  There is no agreement to which Actichem was a party or which was binding on

        Actichem that conflicted with the PSA.

---

[14] Joint Exhibit 3, § 19.

[15] *Id.*

22.     ActiTech did not disclose to MC-GP, Sherman 301-A, or Sherman 301-B that ActiTech had any claim to any of the manufacturing equipment at the Sherman Facility until after the Closing Date.

### B.  The Special Warranty Deed

23.     Elysiann Bishop executed the Special Warranty Deed on behalf of Actichem. Pursuant thereto, Actichem conveyed the tract of land described therein and "all improvements and fixtures thereon and thereto."

### C.  The Bill of Sale

24.     Elysiann Bishop executed the Bill of Sale on July 2, 2021, the Closing Date, on behalf of Actichem. It is an approximately two-page document with no schedule of assets attached. Matthew Coit credibly testified that there were no schedules of assets attached to the transaction documents because it was the parties' understanding that Purchaser was buying everything on site other than inventory and books and records.[16]

25.     Pursuant to the Bill of Sale, Actichem conveyed:

   a.  "all furniture, equipment and machinery, owned by Seller, located on the Real
       Property that is attached to the Property, and the tanks and the water filtration
       system and technology associated with the tanks, located at the South end of the
       facility; and all equipment used in the maintenance and operation of the Property,
       but expressly excluding (i) all equipment, and all other personal property owned

---

[16] Doc. 214, Trial Transcript – Day 3, 26:6-25.

11

by public or private utility contractors located at the Real Property . . . (ii) all cash on hand, checks, money orders, prepaid items, accounts receivable and claims arising prior to the date hereof, (3) **[sic]** all books and records of Seller, (**add property in Contract that is agree to be transferred**) **[sic]** and (4) **[sic]** any Inventory, products, raw material, containers or similar items previously used by Seller in the manufacture of products at the Real Property.[17]

b.   "all of Seller's right, title and interest in and to all permits, license, approvals, entitlements, plans, specifications, architectural and engineering drawings, and other similar intangible property owned by the Seller, if any, used solely in connection with the Real Property . . ."[18]

c.   "all of Seller's right, title and interest in and to any service contracts and other agreements relating to the operation, repair or maintenance of the Real Property, other Personal Property or Intangible Property, the terms of which extend after the date hereof, including any deposits theretofore paid by Seller thereunder for which Purchaser has paid to Seller the cash equivalent and listed on Exhibit 'B', attached hereto" ("Contracts").[19]  Notably, there was no Exhibit "B" attached to the Bill of Sale.

---

[17] Joint Exhibit 7, § 1.
[18] *Id*. at § 2.
[19] *Id.* at § 3.

26.     The court will refer to the personal property identified in the preceding paragraph 25 (which was set forth in paragraphs 1, 2, and 3 of the Bill of Sale) as the "Conveyed Personal Property."

D.  The Temporary Access and Right of Entry Agreement

27.     On or about July 3, 2021 (one day after the Closing Date), Actichem, Sherman 301-A, and Sherman 301-B executed a Temporary Access and Right of Entry Agreement ("Temporary Access Agreement"), pursuant to which Sherman 301-A and Sherman 301-B agreed to permit Actichem temporary access to the Sherman Facility "to remove certain Personal Property as described and defined in the PSA."[20] The Temporary Access Agreement is less than two pages in length.  It merely sets forth protocols for Actichem's access to the Sherman Facility, deadlines, and requirements for insurance.

28.     The Temporary Access Agreement was executed by Elysiann Bishop on behalf of Actichem.

29.     ActiTech was not a party to or given any access or removal rights under the Temporary Access Agreement.  LaCore Nutraceuticals, the Purchaser's new tenant, was also not a party to the Temporary Access Agreement.

30.     Soon after the execution of the Temporary Access Agreement, disputes arose regarding what Actichem would be removing from the Sherman Facility and when.  Apparently, a meeting was held on July 8, 2021 between Actichem and LaCore Nutraceuticals regarding what

---

[20] Joint Exhibit 3, § 34.

13

property Actichem believed it was entitled to, and LaCore Nutraceuticals requested a list, but a list was not delivered until September 17, 2021, and the list was incomplete.[21]   The deadline for Actichem under the Temporary Access Agreement to remove the personal property that was not sold was October 2, 2021—which was 90 days after the Closing Date.  There was a possibility for a 30-day extension.   On or about August 5, 2021, Plaintiffs informed Defendants that they were still in the process of obtaining a moving company.[22]

31.     On or about August 20, 2021, Plaintiffs informed Defendants that they had not yet scheduled moving services but were in the process of finalizing logistics.[23]

32.     The testimony at trial regarding what was happening during this anticipated move-out period was at best spotty and not very revealing of *who*, if anyone, at Actichem and ActiTech was truly focused on retrieving *what* property from the Sherman Facility. In any event, the testimony and other evidence suggests that it was inventory, raw materials, and personal property belonging to Elysiann Bishop that was being discussed—in the communications regarding move-out of property—and not manufacturing equipment.[24]

33.     During the Temporary Access Period, the City of Sherman reached out to Defendants expressing concerns about the Plaintiffs' chemicals, raw materials, and totes of shampoo/conditioner in the facility. The City of Sherman and Defendants became aware that Plaintiffs were apparently disposing of materials contained in, and washing out, totes and barrels

---

[21] Doc. 208 (Declaration of Jenifer Grace), paragraph 4.
[22] Doc. 208 (Declaration of Jenifer Grace), paragraph 8.
[23] Doc. 211, Exhibit A, 81:17-82:6 (Depo. Annette Williams).
[24] Doc. 208 (Declaration of Jenifer Grace); Doc. 207 & Doc. 211, Exhibit A (Depo. Annette Williams).

and disposing of product in the trash compactor or dumpsters. The City of Sherman informed

Defendants, who in turn informed Plaintiffs, that these items could not be washed down the drain

and may not be disposed in the compactor or dumpsters.[25]

34.    LaCore Nutraceutical requested a certification statement from Plaintiffs as to how

they planned to remove and/or dispose of such items.[26]

35.    Plaintiffs failed to sign such certified statement or provide such a plan.[27]

36.    During the Temporary Access Period, Actichem only removed approximately one

truckload of personal property from the Sherman Facility.[28] A customer of ActiTech, TIGI, did

retrieve a few truckloads of product.

37.    Neither ActiTech nor Actichem requested or received an extension of the

Temporary Access Period.

38.    Testimony of witness Gary Metzler, who provides commercial and industrial real

estate brokerage services and was retained by Plaintiffs to find a new business location for

ActiTech after the Closing Date, was very compelling.  The testimony was convincing that he was

working mightily to find a new location for ActiTech during the Temporary Access Period. His

efforts went from attempting to find a new manufacturing and warehouse property for it (he

identified many possibilities), to transitioning to storage (again, he found many possibilities), to

being told that things were being delayed because of lawyers. He scheduled many tours of

---

[25] Doc. 208 (Declaration of Jenifer Grace), paragraph 7.
[26] *Id*., paragraph 9.
[27] *Id*.
[28] Doc. 211, Exhibit A, 103:11-15; 106:14-107:16 (Depo. Annette Williams).

properties that were cancelled by Elysiann Bishop and Annette Williams (her point person on moving).[29] The court found the Metzler testimony to be credible evidence that suggested a lack of urgency on the part of Plaintiffs to retrieve whatever items at the Sherman Facility they believed they owned.

39.     Actichem and ActiTech were notified that Sherman 301-A and Sherman 301-B would assume that all items remaining at the Sherman Facility after the end of the Temporary Access Period were abandoned by Plaintiffs.

40.     Since the termination of the Temporary Access Period, approximately 141,619 square feet of the Sherman Facility have been used to store the property required to be removed by ActiTech and/or Actichem (e.g., the Inventory, raw materials, containers, and personal items belonging to Elysiann Bishop).[30]

41.     On October 11, 2022, Plaintiffs and Defendants together filed a stipulation (the "Stipulation") to allow Debtor limited access to remove inventory, raw materials, product samples, and other personal property from the Sherman Facility.[31]

42.     Plaintiffs failed to remove the inventory, raw materials, product samples, and the other property by the deadline that was set forth in the Stipulation.

43.     This court entered an order on December 28, 2022, requiring Plaintiffs to immediately remove at their sole expense, all property and product samples listed in the Stipulation

---

[29] Doc. 210 (Declaration of Gary Metzler with numerous attachments).
[30] Doc. 208 (Declaration of Jenifer Grace), paragraphs 3-13.
[31] *See* Doc. 169.

and that, in the event they failed to do so, Defendants could remove the same and would be entitled to reimbursement for all reasonable costs associated with removal and disposal.[32]

44.    To the extent any of the foregoing findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of facts, they are adopted as such.

### III.    CONCLUSIONS OF LAW

1.    Bankruptcy subject matter jurisdiction exists in this Adversary Proceeding pursuant to 28 U.S.C. § 1334.  This is a statutory core proceeding, pursuant to at least 28 U.S.C. §157(b)(2)(B), (C) and (E); thus, the bankruptcy court has statutory authority to enter a final order. To the extent there is any dispute regarding the core nature of the claims in this Adversary Proceeding, the court deems the parties to have consented to final adjudication by the bankruptcy court.[33]

2.    This court has determined that it has constitutional authority to enter a final order in this matter. Venue is proper before this court, pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    ActiTech has standing to bring these claims against Defendants.[34]

---

[32] *See* Doc. 218.

[33] While the Defendants' answers disputed the bankruptcy court's core jurisdiction, they never moved for withdrawal of the reference or challenged the bankruptcy court's ability to adjudicate this matter.  In fact, the Defendants articulated seven counterclaims against the Debtor (i.e., both Plaintiffs), in the Joint Pretrial Order, and asked the Bankruptcy Court for relief on same. Doc 167, at pp. 3-4. The court deems these actions to be consent.

[34] At trial and in their post-trial brief, Defendants alleged for the first time that ActiTech does not have standing to be a Plaintiff in this Adversary Proceeding because it lacks a limited partner, which is required under Texas law for a limited partnership to exist. According to Defendants, the undisputed evidence is that ActiTech's limited partner, Active Organics, Inc. f/k/a Active Organics, LP, was sold to and merged with Lipotec USA, Inc. F u r t h e r a c c o r d i n g  t o  D e f e n d a n t s ,  b ecause a party that lacks a legal or factual existence under Texas law may not prosecute a lawsuit and obtain a judgment in its favor, they contend ActiTech is not entitled to a judgment as a matter of law. *See* Post-Hearing Brief, Doc., 220 at n. 1—which cites no specific authority.  The court finds this argument

4.      This Adversary Proceeding all boils down to what property was conveyed and what was excluded from the PSA and Bill of Sale.  Defendants argue that just about everything at the Sherman Facility was conveyed.  They argue that the PSA and Bill of Sale contemplated the purchase of a ***$19 million manufacturing facility***, essentially lock, stock, and barrel.  The evidence (dozens of pictures) presented at trial showed that almost everything at the facility is bolted or affixed to the ground in one form or another.  Defendants argue that the only excluded property at the Sherman Facility was inventory (in various stages of completion or noncompletion—including raw materials), books and records, some furniture and office equipment, and some personal items of Ms. Bishop.[35]

5.      Meanwhile, the theory of Plaintiffs' case is largely that the Debtor ActiTech was the operating company and Actichem was a mere real estate holding company. Accordingly, the Plaintiffs assert that ActiTech was the owner of everything at the Sherman Facility that was not an improvement or real estate fixture that might have become a part of the real property. The theory is that Actichem could not sell what it did not own, and ActiTech did not sell anything—it was not party to any of the transaction documents. To be clear, ActiTech takes the position that much of what is at the Sherman Facility was in the nature of ActiTech's removable trade fixtures. Though

---

unsubstantiated and unpersuasive. Moreover, the court also notes that this issue was only superficially referred to in the Pre-Trial Order (see Doc. 167, ¶¶ 29 & 30 therein), which governs this proceeding.

[35] Certain documentary evidence (e.g., bills of sale, etc.) and testimonial evidence presented by Defendants showed that some of the personal property now located at the Sherman Facility was acquired by Defendants from third parties and brought into the Sherman Facility after closing. Such items are the property of Defendants and do not potentially fall into the categories of Disputed Personal Property.  Doc. 208 (Declaration of Jenifer Grace), ¶ 19 & Exhibit B attached thereto; Defendants' Exhibits 21-71, 103.

there were bolts and sometimes concrete fixing machinery and equipment to the ground, all of this could be removed they say—and that was the parties' intention.

6.    The court will now refer to all personal property which ActiTech asserts that it owns and wants turned over as the "Disputed Property"—i.e., inclusive of any machinery or manufacturing equipment that, it argues, was not a part of the real estate and was essentially its removable trade fixture.

7.    Normally this court would simply look at the four corners of the transaction documents (i.e., the PSA, the Bill of Sale, the Special Warranty Deed, and the Temporary Access Agreement) and interpret them to determine what was sold.  If the documents are ambiguous, the court may consider extrinsic evidence.[36]

8.    Both Plaintiffs and Defendants took the position here that the transaction documents were not ambiguous. The court struggled with this notion quite a bit. For one thing, the Bill of Sale, as earlier noted, stated that Seller was selling    "all furniture, equipment and machinery, owned by Seller, located on the Real Property that is attached to the Property, and the tanks and the water filtration system and technology associated with the tanks, located at the South end of the facility; and all equipment used in the maintenance and operation of the Property, but expressly excluding . . . (3) all books and records of Seller, *(add property in Contract that is agree to be transferred) [sic]* and (4) any Inventory, products, raw material, containers or similar items

---

[36] Even if the agreement appears unambiguous on its face, extrinsic evidence may be offered if "relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Isbell v. DM Records, Inc.*, 774 F.3d 859 (5th Cir. 2014) (quoting *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 69 Cal.Rptr. 561, 442 P.2d 641, 644 (1968)).

previously used by Seller in the manufacture of products at the Real Property. Not only does there appear to be a drafting bust of some sort (with regard to the parenthetical suggesting property was supposed to be added somewhere therein), but the court considers it very atypical for there not to be a schedule of assets included as part of either a purchase and sale agreement or a bill of sale.

9.      On balance, the court believed that extrinsic evidence was necessary to consider here for two reasons.  First, even if the documents are unambiguous, there is a question of what ActiTech actually owned.  ActiTech was not a party to the transaction documents, so, indeed, *it* could not have sold anything pursuant thereto, and Actichem, which was the seller, could not sell what it did not own.  Second, at some point, personal property can become so attached or affixed to real property so as to become part of the real property. Moreover, such property could be a tenant's trade fixture.  So, the court was required to consider evidence regarding ownership and also regarding the "fixture" question.

A. Evidence of Ownership of Disputed Property.

10.     Plaintiffs had the burden of proof, by a preponderance of the evidence, to establish that ActiTech owned the Disputed Property (as opposed to Actichem). Plaintiffs failed to introduce sufficient evidence to show the property in question was owned by ActiTech, not Actichem.[37] The only evidence was: (a) the simple fact that ActiTech was an operating company (implying it, ergo, owned all the operating assets); (b) certain ad valorem tax statements indicating ActiTech was billed for personal property taxes;[38] and (c) the testimony of Elysiann Bishop at trial.  With regard

---

[37] Doc. 213, Trial Transcript – Day 2, 123:5-8.
[38] Doc. 212, Trial Transcript – Day 1, 61:16-23.

to the latter, Ms. Bishop was frequently somewhat equivocal in her testimony—perhaps because her ex-husband originally owned and ran these companies, and she received them in a divorce. She testified credibly that she had always had involvement with the companies (and she seemed highly credible **on the subject of products developed and sold**), but the court did not have a sense that she had much of a foundation or history with the transactions at issue. The court believes that her conclusory testimony as to the ownership of the Disputed Property is insufficient as a matter of law.[39]

### B. Evidence of the Fixture Status or Trade Fixture Status of Disputed Property.

11.     Additionally, Plaintiffs failed to prove that the Disputed Property either: (a) were **not "fixtures"**; or (b) **if "fixtures,"** constituted ActiTech's **"trade fixtures."** To be clear, fixtures and trade fixtures are two slightly different concepts.

12.     "Texas law treats trade fixtures as a subset, or a special type, of fixtures—in order for an article to be a trade fixture, it must first be a fixture generally." *In re San Angelo Pro Hockey Club, Inc.*, 292 B.R. 118, 130 (Bankr.N.D.Tex. 2003) (citing *Jim Walter Window Components v. Turnpike Distribution Ctr.*, 642 S.W.2d 3, 5 (Tex. App.—Dallas 1982, writ ref'd n.r.e.)).

13.     In general, fixtures are items of personalty so attached to the soil that they become a permanent part of the realty.[40] The Texas Supreme Court has provided three factors to determine

---

[39] *Foust v. Old Am. Cty. Mut. Fire Ins. Co.*, 977 S.W.2d 783, 787 (Tex. App.—Fort Worth 1998, no pet.) ("Determination of ownership is a conclusion of law based upon established facts. … 'In a case where ownership, legal or equitable, …is an issue between the parties, their statements as to ownership can constitute no more than an expression of their conclusions as to such.'" (citations omitted)).
[40] *See, e.g.*, *Logan v. Mullis*, 686 S.W.2d 605, 607 (Tex. 1985).

whether personalty becomes a fixture: "(1) the mode and sufficiency of annexation [to the realty], either real or constructive; (2) the adaptation of the article to the use or purpose of the realty; and (3) the intention of the party who annexed the chattel to the realty."[41] The third factor—intent—is the "preeminent factor" while the first and second factors serve as evidence of intent.[42] To find intent, "objective manifestations" are required.[43] Finally, intent is a question of fact to be decided by the factfinder, unless reasonable minds cannot disagree, in which case the issue can be decided as a matter of law.[44] Additionally, although intent is the most important factor, the threshold question in a fixture analysis is whether the item is annexed to the soil, actually or constructively.[45] Without real or constructive annexation to the freehold, the inquiry stops, and the item remains a personalty.[46]

---

[41] *Id.*

[42] *Id.*

[43] *Id.* at 608.

[44] *See id.*

[45] *See, e.g., Sonnier v. Chisolm-Ryder Co.*, 909 S.W.2d 475, 479 (Tex. 1995).

[46] *See id.* With regard to attachment, courts tend to look to the physical characteristics of the item at issue and examine how it is attached to the land. For example, in *Connelly v. Art & Gary, Inc.* 630 S.W.2d 514, 514-15 (Tex. App.—Corpus Christi 1982, writ ref'd n.r.e.), the court noted that the item at issue—a former tenant's sign in front of his business—was "forty-six feet high, sixteen feet wide, and extends approximately twelve feet into the ground" with the portion underground being "encased in cement." The court in *Van Valkenburgh v. Ford*, 207 S.W. 405, 419-21 (Tex. App.—Galveston 1919) went even further in detail of some manufacturing equipment, noting that one of the engines at issue had 75 horsepower, weighed 30,000 pounds, was set upon a raised concrete bed that was "6 feet deep, 13 feet in length, by 9 feet wide at its base, and 11 feet long by 9 wide," and was attached to the concrete bed by "iron bolts 4 feet long, which were laid with a bend in them, and the concrete poured on top of that." The courts in both *Van Valkenburgh* and *Connelly* concluded that the items were annexed in a manner that evidenced an intent to permanently attach the items to the realty. In contrast, without annexation to the soil, courts will stop the analysis at this first step even in the face of clear evidence that a party intended to permanently affix the item to the realty. In *Melendez v. State*, 902 S.W.2d 132, 137 (Tex. App.—Houston [1st Dist.] 1995, no pet.), the court was settling a dispute regarding steel tresses lying on the ground with which a property owner was going to construct a building. The court concluded, despite "ample evidence" showing the owner's intention to construct a building with the tresses, that "the simple fact of the matter is that he did not erect a building." Without annexation to the realty, the court stopped its analysis and concluded that the items were not fixtures. But items need not be physically attached to the realty for courts to find annexation. In *Reames v. Hawthorne–Seving, Inc.*, 949 S.W.2d 758, 762 (Tex. App.—Dallas 1997, pet. denied), the court concluded that a conveyor belt on wheels was *constructively* annexed to the realty despite workers regularly

14.     Trade fixtures, like fixtures, are items of personalty that have been annexed to the soil, but trade fixtures differ in that they are annexed ***by a tenant*** carrying out its trade or business.[47] As a subset of fixtures, trade fixtures must first meet the requirements of a fixture, and then meet an additional three requirements: they must be (1) annexed to the property ***in the context of a lease***; (2) annexed ***by a tenant*** to carry on its business; and (3) removable without material or permanent injury to the realty.[48] If an item is a trade fixture, the tenant retains title to the personalty and has the right to remove it at the end of the lease.[49] The distinction between a fixture and trade fixture stems from a policy favoring trade and encouraging industry.[50] "Improvements made by a vendor, mortgagor or ancestor are made to enhance the value of the estate, and to be permanent; while those made by the tenant are temporary and made for purposes of his trade."[51] And "[a] trade fixture does not lose its character as personalty because the intent of its annexation is to further the purposes of the tenant's trade, not to improve the realty."[52]

15.     First, Plaintiffs failed to meet their burden to establishing the Disputed Property is not fixtures.  It is impractical, to say the least, for this court to address every single one of the hundreds of items of Disputed Property.  Suffice it to say that the machinery and equipment are in many cases very large or heavy and, as noted earlier, are typically bolted or, in some cases,

---

moving the conveyor belt to clean underneath because the factory operator "never intended to move it more than a few feet as necessary for its operations and never moved it for any other purpose."

[47] *See Sonnier v. Chisolm-Ryder Co.*, 909 S.W.2d at 479.
[48] *See In re San Angelo Pro Hockey Club, Inc.*, 292 B.R. 118, 129 (Bankr. N.D. Tex. 2003).
[49] *See Fenlon v. Jaffee*, 553 S.W.2d 422, 429 (Tex. Civ.—Tyler 1977, writ ref'd n.r.e.).
[50] *See Jim Walter Window v. Turnpike Distrib.*, 642 S.W.2d 3, 5 (Tex. App.—Dallas 1982, writ ref'd n.r.e.).
[51] *Id.* (quoting *Menger v. Ward*, Tex. Civ. App., 28 S.W. 821, 823 (San Antonio 1894)).
[52] *Eun Bok Lee v. Ho Chang Lee*, 411 S.W.3d 95, 110 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

23

concreted to the real property. By any reasonable interpretation, they became a part of the realty to which they are connected and were adapted to the use or purpose of the realty—i.e., manufacturing. The evidence was that most of the machinery and equipment was installed by the former owner Johnson & Johnson.  Therefore, we do not know its intent.  Technically, any man-made structure can be dissembled and removed from land.  But it would seem to be a matter of degree, when it comes to manner of attachment, and intention can be inferred from the nature of the article affixed, the structure and mode of annexation, and the purpose or use for which the annexation has been made.  It seems reasonable to infer that someone (presumably Johnson & Johnson) intended to create a lasting, massive manufacturing facility.  It spans over 500,000 square feet. This was a massive investment, and it is illogical to assume this was all erected with the intention of taking it all down any time in the near future.

16.     Next, having concluded the Disputed Property was "fixtures," Plaintiffs failed to meet their burden of establishing the Disputed Property constituted "trade fixtures." To reiterate, for there to be a trade fixture, (1) the article must be annexed *in the context of a lease*; (2) the article must be annexed *by the tenant* to enable the tenant to carry on its business; and (3) the article must be able to be removed without material alteration or permanent injury. As noted earlier, there was no written lease between Actichem and ActiTech (although it seems clear that they both acted as though there was one and ActiTech paid rent to Actichem).  But even assuming that there was an unwritten, de facto lease between ActiTech and Actichem, Plaintiffs failed to present sufficient evidence as to what items of the Disputed Property might have been installed by ActiTech as a tenant in the context of its lease with Actichem. The evidence suggested that the

24

vast majority of the Disputed Property was part of what Actichem purchased from Johnson & Johnson back in 2005.[53]  Plaintiffs also presented, at best, speculative evidence as to the possible removal of the Disputed Property without damage to the underlying estate.[54]

### C.  More Regarding the Lack of Evidence

17.     To be blunt, the transaction documents here were not the model of clarity or good drafting.  As noted, there were no Schedules of Assets.  There was a drafting bust in the Bill of Sale—a parenthetical note to ***"(add property in Contract that is agree to be transferred)"*** and a reference therein to an Exhibit A and B that were not attached. There was no reference to ActiTech in the PSA and no attempt to define what might be a fixture or improvement or what it meant in this context to be something "attached" to the real property. There was no clear term explaining what might be meant by language in the Bill of Sale referencing the conveyance of "machinery and equipment ***used in the maintenance and operation of the manufacturing building***"—was that really a phrase meant to narrow the universe of machinery and equipment being conveyed?

18.     Extrinsic evidence was needed here.  Some was presented—but not much of the kind that might have been elucidating to the court.  For example, why didn't Plaintiffs call John LaBonte to testify (the CEO of LaCore Nutraceuticals who previously was the General Manager of ActiTech)?  Wouldn't he have had useful knowledge regarding the Disputed Property?

19.     What about David Dunaway or Tre Black?  Communications received into evidence made by David Dunaway absolutely seemed to demonstrate the parties' intent to include the

---

[53] Doc. 212 Trial Transcript – Day 1, 130:3-6; *see also, e.g., id.* at 150:3-151:2.
[54] Doc. 213 Trial Transcript – Day 2, 41:15-18, 159:23-160:16.

Disputed Property in the PSA. While Plaintiffs disputed that David Dunaway was Actichem's broker, the plain terms of the PSA identified him and Tre Black as collectively the "Broker" that Actichem was using in the underlying transaction.[55] And Actichem apparently paid over $550,000 in commission to David Dunaway and Keller Williams.[56] Based on this, it is reasonable to conclude that David Dunaway had authority to act on Actichem's behalf. David Dunaway, acting under such authority, represented to Defendants' representative Mathew Coit that "everything" would be sold "as is" and specifically that "[Defendant(s)] would get the equipment."[57] Plaintiffs failed to contradict the evidence showing that Actichem had actual and apparent authority to sell the Disputed Property, even if it was owned by ActiTech.

20.    What about testimony from the transaction lawyers on the deal (Anthony Farmer or Ira Levy)?

21.    What about testimony from an appraiser?  Would $19 million really have been a fair price for the Sherman Facility if it was going to be completely dismantled and the manufacturing machinery and equipment ripped up and removed?

22.    What about testimony from one of the movers that Plaintiffs were allegedly contacting to remove the Disputed Property during the Temporary Access Period?  Wouldn't that have been relevant as to what was intended and how long this would all take?

---

[55] Joint Exhibit 3, § 12.
[56] Defendants' Exhibit 128, p. 2; *see also*, Defendants' Exhibits 126-127.
[57] Defendants' Exhibit 123, p. 4.

23.     What about testimony from an expert regarding what type of effort and time would be involved to remove the Disputed Property?

24.     Whatever the reasons for the lack of witnesses, the conclusion here is that Plaintiffs did not meet their burden of proof.

25.     Plaintiffs did not meet their burden of proving either: (a) the Disputed Property was not intended to be included in the PSA; (b) that the Disputed Property was ***not*** fixtures; or (c) that it was trade fixtures.

### D.  Defendants' Counterclaims

26.     Actichem breached the PSA. The PSA obligated Actichem to remove the Inventory, raw materials and product/containers from the Sherman Facility during normal business hours within ninety (90) days after the closing ("Temporary Access Period").[58] Actichem breached the PSA by failing to remove all of the Inventory within the Temporary Access Period in accordance with the Temporary Access Agreement.

27.     Sherman 301-A and Sherman 301-B are owners of the Sherman Facility and LaCore Nutraceuticals is a tenant with the lawful right of possession and actual possession of the Sherman Facility.[59] ActiTech has failed to remove its Inventory following Closing and/or prior to the termination of the Temporary Access Agreement. Since at least October 2, 2021, the Inventory has occupied approximately 140,000 square feet of the total space at the Sherman Facility without

---

[58] Joint Exhibit 3, § 34.
[59] *See generally*, Joint Exhibit 5; Joint Exhibit 6; Doc. 209 (Declaration of John R. Britten), ¶¶ 1-3; Doc. 208 (Declaration of Jenifer Grace), ¶ 19 and Exhibit B attached thereto.

the consent of any of the Defendants. ActiTech's continued possession of the Sherman Facility, by virtue of its failure to remove 140,000 square feet of Inventory, without the consent of any of the Defendants, constitutes a trespass for which ActiTech is liable. Thus, ActiTech committed trespass by failing to remove this property from the Sherman Facility.[60]

28.     As a result of Plaintiffs' trespass, LaCore Nutraceuticals, Inc. has incurred storage costs to be addressed in a separate judgment.

29.     Plaintiffs are not entitled to judgment against Defendants for declaratory relief.

30.     Plaintiffs are not entitled to judgment against Defendants for turnover relief.

## IV.     CONCLUSION

Per this court's prior order, Plaintiffs are jointly responsible for (a) paying all costs of removal of the property that was the subject of parties' Stipulation from the Sherman Facility, and (b) planning the logistics of removal of such property from the Sherman Facility. Defendants are not responsible for paying any removal costs of such property from the Sherman Facility or for planning the logistics of removal of such property from the Sherman Facility.

Defendants have also requested reasonable attorney's fees spent in connection with this proceeding.  Under the "American Rule," each party to litigation pays its own fees arising out of litigation, unless a fee-shifting provision exists pursuant to statute or contract.[61] Under the PSA, in

---

[60] A tenant who remains in possession of the premises (including possession by virtue of a failure to remove personal property) after termination of a lease without the consent of the landowner or land possessor is a trespasser. *Howeth v. Anderson*, 25 Tex. 557, 572 (Tex. 1860) (explaining that a landlord may treat a holdover tenant as a "trespasser").
[61] *See, e.g., Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 247, 263 (1975); *Key Tronic Corp. v. United States*, 511 U.S. 809, 819 (1994); *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006).

the event of litigation, the prevailing party is entitled to recover its attorney's fees from the non-prevailing party.[62] Therefore, Defendants are entitled to reasonable attorneys' fees.

The bankruptcy court directs Defendants, within 14 days, to submit a form of Judgment that calculates proper amounts due for **attorney's fees**. The costs and attorneys' fees calculation shall be separately filed as a Notice with backup documentation attached. Plaintiffs shall have 14 days after the filing of such Notice to file an objection to the reasonableness of the attorneys' fees and costs.

The bankruptcy court directs Defendants to include within the submitted form of Judgment the amount it seeks for **storage costs**. These shall be separately filed as a Notice with backup documentation attached. Plaintiffs shall have 14 days after the filing of such Notice to file an objection to the storage costs.

Finally, the bankruptcy court directs Defendants to include within the submitted form of Judgment the amount it seeks for any reimbursement of amounts it has incurred for **removal of the Disputed Property** (pursuant to prior Stipulations and the order of this court). These shall be separately filed as a Notice with backup documentation attached. Plaintiffs shall have 14 days after the filing of such Notice to file an objection to the removal costs.

All relief requested by Plaintiffs is denied.

All relief requested by Defendants that is not expressly granted herein is denied.

### ###END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW###

---

[62] Joint Exhibit 3, § 26.